Opinion for the Court filed by Circuit Judge BROWN.
Concurring opinion filed by Chief Judge SENTELLE.
Concurring opinion filed by Circuit Judge HENDERSON.
Dissenting opinion filed by Circuit Judge ROGERS.
Dissenting opinion filed by Circuit Judge KAVANAUGH, with whom Circuit Judge TATEL joins.
BROWN, Circuit Judge:
Appellant Bryan Burwell was part of a crew of bank robbers that engaged in a violent crime spree across the D.C. Metro area. The crew employed decidedly old-school tactics, including subduing bystanders by brandishing AK-47s, pistol whipping a victim, and spraying a pursuing police car with bullets. After a lengthy jury trial and an appeal before a panel of this Court, only a single legal question remains: whether 18 U.S.C. § 924(c)(l)(B)(ii), which imposes a mandatory thirty-year sentence for any person who carries a machinegun while committing a crime of violence, requires the government to prove that the defendant knew the weapon he was carrying was capable of firing automatically. To resolve this question, we reexamine one of our longstanding precedents, United States v. Harris, 959 F.2d 246, 257-59 (D.C.Cir.1992), in light of intervening decisions of the Supreme Court.
I
This appeal, which focuses on a narrow question of law, requires only an abbreviated version of the essential underlying facts. Between 2003 and 2004, a gang of robbers committed six armed bank heists; Burwell, who joined the crew in the middle of the crime spree, participated in two. Before Burwell joined up, Noureddine Chtaini, the nominal leader, along with Miguel Morrow and Omar Holmes, bought four fully automatic AK-47S.[1] The crew carried these weapons in all their subsequent bank robberies, and on one occasion, “sprayed” bullets at a pursuing police car. Following this particular robbery, Burwell said he wanted to start robbing banks with the crew. He carried an AK-47 in both of the robberies in which he participated, though there is no evidence he fired any of the weapons.
A grand jury issued an indictment charging Burwell and his co-defendants with, inter alia, RICO conspiracy and armed bank robbery conspiracy. They also charged Burwell with one count of armed bank robbery and one count of using or carrying a firearm during a violent crime. A jury returned verdicts as to all *503 defendants on July 15, 2005, convicting each of RICO conspiracy and conspiracy to commit armed bank robbery. In addition, it convicted Burwell of armed robbery and of using or carrying a machinegun in relation to a violent crime. The district court sentenced Burwell to concurrent prison terms of 135 months each for RICO conspiracy and armed bank robbery, ■ 60 months for conspiracy to commit armed bank robbery, and a consecutive term of 360 months for using or carrying a machinegun during the robbery.
On appeal, Burwell argued the government presented insufficient evidence to support his conviction under 18 U.S.C. § 924(e)(l)(B)(ii) because the government failed to show he knew the AK-47 he carried was capable of firing automatically. All four weapons could function in both semiautomatic and fully automatic modes through the use of a selector switch — a lever on the side of the weapon that slides up and down to allow the user to choose between safe, semi-automatic, and fully automatic'modes. But at trial, both parties’ firearms experts agreed that 'the weapons contained no clear markings indicating that they could be put into automatic firing mode. The defense’s expert, William Welch, testified that “[t]here’s some letters here [near the selector switch] that I cannot identify because they’re probably written in a foreign language, but they’re only letters, not words.” Welch determined that the AK-47 could fire in automatic mode by noticing that the selector switch had three positions, which he “was kind of looking for ... anyway,” and by disassembling the gun.
Section 924(e)(1)(A) provides for a mandatory consecutive sentence of at least five years for any person who uses or carries a firearm “during and in relation to” a crime of violence or drug trafficking crime, or for any person who possesses a firearm “in furtherance of’ such crime. The mandatory sentence skyrockets to thirty years, however, if the firearm involved was a machinegun. 18 U.S.C. § 924(c)(l)(B)(ii). A machinegun is defined as “a gun-capable of firing automatically, that is, of firing several bullets with one pull on the trigger.” Harris, 959 F.2d at 257. The court upheld the jury verdict and sentence, finding that this Court’s decision in Harris dictated affirmance.
In Harris, the Court concluded Congress “inten[ded] to apply strict liability” to the machinegun provision of § 924(c). 959 F.2d at 258. The Court began its analysis by recognizing the general presumption in favor of a mens rea requirement in criminal cases, but reasoned that § 924(c)(1) already requires a defendant to have “intentionally” used a firearm in committing a predicate crime, and to have done so with “knowledge that the objects used to facilitate the crime are ‘firearms.’ ” Id. at 258-59. Thus, the statute does require “[deliberate culpable conduct” as to “the essential elements of the crime ... before the issue of sentence enhancement for use of a machine gun arises.” Id. at 259. The , structure of the statute, the Court found; supported the inference that Congress intended no additional mens rea requirement to apply to the machinegun element.
Burwell, aided by amici curiae National Association of Criminal Defense Lawyers (“NACDL”) and the Federal Public Defender (“FPD”), sought rehearing en banc, claiming the Supreme Court’s decision-in United States v. O’Brien, — U.S. -, 130 S.Ct. 2169; 176 L.Ed.2d 979 (2010)— which held that § 924(c)(l)(B)(ii) is an element of the offense, rather than a sentencing factor — implicitly overruled Harris. Burwell also claims contrary decisions of other circuits support abandonment of Harris. Harris’s interpretation of *504 § 924(c) is, he contends, fundamentally-flawed as a matter of law. We disagree on all counts, and conclude the high burden imposed on any party who urges this Court to depart from the principle of stare decisis has not been satisfied.
II
By claiming § 924(c)(1)(B)(ii) contains an additional, implicit mens rea requirement, Burwell asks us to set aside a circuit precedent that has governed our interpretation for twenty years.
“[T]he doctrine of stare decisis is of fundamental importance to the rule of law.” Welch v. Texas Dep’t of Highways & Pub. Transp., 488 U.S. 468, 494, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). “[A]ny departure from the doctrine ... demands special justification.” Arizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). The burden borne by a party urging the disavowal of an established precedent is greater “where the Court is asked to overrule a point of statutory construction ... for here, unlike in the context of constitutional interpretation, ... Congress remains free to alter what we have done.” Patterson v. McLean Credit Union, 491 U.S. 164, 172-73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).
Overturning a statutory precedent is justified under a very narrow range of circumstances, such as cases in which an “intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress,” necessitates a shift in the Court’s position. Id. at 173, 109 S.Ct. 2363. Precedents may also be abandoned where an intervening development “ha[s] removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies.” Id. The Court has also overruled prior cases where the precedent “may be a positive detriment to coherence and consistency in the law, either because of inherent confusion created by an unworkable decision, or because the decision poses a direct obstacle to the realization of important objectives embodied in other laws.” Id.
A court of appeals sitting en banc may also reexamine its own interpretation of a statute “if it finds that other circuits have persuasively argued a contrary construction.” Critical Mass Energy Project v. NRC, 975 F.2d 871, 876 (D.C.Cir.1992) (en banc). Or an en banc court may set aside its own precedent “if, on reexamination of an earlier decision, it decides that the panel’s holding on an important question of law was fundamentally flawed.” Id.
a. Effect of Subsequent Supreme Court Decisions
Burwell and NACDL rely on the Supreme Court’s recent decision in United States v. O’Brien, which held that possession of a machinegun “[was] an element to be proved to the jury beyond a reasonable doubt,” not a “sentencing factor” to be proved to the judge by a preponderance of the evidence at sentencing. 130 S.Ct. at 2172. According to NACDL, the Harris Court justified departing from the traditional presumption in favor of mens rea by finding the machinegun provision is not an “essential element of the crime” but rather a “sentence enhancement.” See Harris, 959 F.2d at 258-59. If the machinegun provision is an essential element of the crime, they argue, it must also be afforded the presumption of a mens rea requirement.
It is far from clear, however, that the classification of § 924(c)(l)(B)(ii) as a “sentencing factor” was one of the “conceptual underpinnings” of Harris. Much like the *505 Supreme Court’s recent decision in Flores-Figueroa, 129 S.Ct. 1886 (2009), Hams’s holding turned on the Court’s interpretation of § 924(c) “using the usual tools of statutory analysis” in an attempt to determine congressional intent. 959 F.2d at 258. Specifically, the Court focused on the structure of the statute, ie. the separation between the elements of the underlying crime and the machinegun provision, and its judgment that Congress would not have required an additional showing of mens rea beyond what the government must prove with respect to the predicate crime and the use of a firearm. See id. at 258. The Court also found other circuits’ conclusions that no showing of additional mens rea was required for “aggravating elements” of similar statutes persuasive. See id. Nothing turned on whether the machinegun provision was considered an- element of the offense or a sentencing factor. Moreover, the Harris Court referred to the machine-gun provision as both an “element of the offense,” id. at 258, and a “sentence enhancement,” id. at 259, making it clear that its holding did not depend on which description more accurately characterized the machinegun provision. It is thus unclear how much, if at all, the rationale of Harris relies upon the Court’s apparent assumption that § 924(c)(l)(B)(ii) was a “sentence enhancement” rather than an element of the offense.
But Burwell makes an even broader claim, arguing that O’Brien’s holding implicitly overruled Harris because offense elements require proof of mens rea while sentencing factors may not. While Bur-well can marshal some support for this argument from expansive dicta in decisions from the Supreme Court and this Circuit, close reading of these cases reveals that his argument is overstated.
First, Burwell’s suggestion that the label “element of the offense,” as opposed to “sentencing factor,” is determinative of the mens rea requirement is misguided. Had the Supreme Court viewed that distinction as dispositive, it would not have explicitly declined to decide whether “a defendant who uses, carries, or possesses a firearm must be aware of the weapon’s characteristics” in O’Brien. 130 S.Ct. at 2173. At the very least, the Court’s reservation suggests there is more to the analysis than a simple equation.
Second, before mechanically applying a presumption — particularly a presumption as sweeping as the one put forward here— it seems prudent to revisit first principles. The Supreme Court developed the presumption in 'favor of mens rea for one particular reason: to avoid criminalizing otherwise lawful conduct. One of the earliest cases to adopt a presumption in favor of mens rea was United States v. U.S. Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), in which the Court evaluated whether intent was an element of a criminal antitrust offense. Relying primarily on Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Court noted that its precedents “can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an interpretative presumption that mens rea is required.” 438 U.S. at 437, 98 S.Ct. 2864. The Court further noted that strict liability offenses, while “not unknown to the criminal law” and not invariably violative of the Constitution, are “generally disfavored.” Id. at 437-38, 98 S.Ct. 2864. Up to this point, the case appears to support Bur-well’s position.
Further analysis, however, reveals that the Court inferred a mens rea requirement because “the behavior proscribed by the [Sherman] Act is often difficult to dis *506 tinguish from the gray zone of socially acceptable and economically justifiable business conduct.” Id. at 440-41, 98 S.Ct. 2864. Not requiring the government to prove criminal intent in such a situation would risk using criminal sanctions simply to “regulate business practices,” a result not intended by Congress. Id. at 442, 98 S.Ct. 2864. In other words, the Court inferred a mens rea requirement because criminal intent was necessary to differentiate a violation of the Act from otherwise lawful business conduct.
The Court applied the same principle in Staples v. United States, when it implied a mens rea requirement in 26 U.S.C. § 5861(d), a provision that made it “unlawful for any person ... to receive or possess a firearm which is not [federally] registered.” 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). The Court held the statute did require the Government to prove mens rea because a contrary ruling would “criminalize a broad range of apparently innocent conduct.” Id. at 610, 114 S.Ct. 1793. In closing, the Court favorably cited a different section of our Harris opinion, in which we held that weapon-specific knowledge is required in a prosecution under § 5861(d), reasoning that “if Congress had intended to make outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapons, and to subject them to lengthy prison terms, it would have spoken more clearly to that effect.” Id. at 620, 114 S.Ct. 1793; see Harris, 959 F.2d at 261 (“We believe that if Congress, against the background of widespread lawful gun ownership, wished to criminalize the mere unregistered possession of certain types of firearms[,] ... it would have spoken clearly to that effect.”).
Similar concerns prompted application of the presumption in United States v. X-Citement Video, Inc., 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), in which the Court held that 18 U.S.C. § 2252 requires knowledge that a performer in a sexually explicit video actually is a minor. As in Staples, the Court feared that not requiring proof of mens rea “would sweep within the ambit of the statute actors who had no idea that they were even dealing with sexually explicit material,” such as a retail druggist who returns an uninspected roll of developed film to a customer. Id. at 69, 115 S.Ct. 464. Indeed, the court clarified the scope of the presumption by explaining that “Morissette, reinforced by Staples, instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct.” Id. at 72, 115 S.Ct. 464 (emphasis added).
Our own recent precedent follows the same logic. In United States v. Project on Government Oversight (“POGO”), 616 F.3d 544 (D.C.Cir.2010), this Court adopted the presumption that “criminal statutes and regulations contain a mens rea element unless otherwise clearly intimated in the language or legislative history.” Id. at 549. Like Staples and XCitement Video, however, POGO also involved a statute that criminalized otherwise lawful behavior — in this case, contributions to public officials. The Court based its application of the presumption on a similar concern about criminalizing otherwise innocent conduct. Absent an intent requirement, “a parent’s monthly checks to a child who works for the government could be construed as violating § 209(a): only the parent’s intent distinguishes payments to help cover the rent from payments to subsidize what the parent regards as an insufficient public-sector salary.” Id. at 550. Thus, this Court made clear the presumption in favor of mens rea was triggered by the need to avoid imposing substantial penalties — including jail sentences — on innocent citi *507 zens who had no idea they were committing a crime.
The concerns animating the presumption in favor of mens rea in Morissette, U.S. Gypsum, Staples, X-Citement Video, and POGO simply are not present here. Section 924(c)(l)(B)(ii) poses no danger of ensnaring “an altar, boy [who made] an innocent mistake,” Harris, 959 F.2d at 259, because the government must first prove the defendant is guilty of either drug trafficking or a violent crime, and must further prove that the defendant intentionally used or carried a firearm, or intentionally possessed a firearm, during or in furtherance of that offense. Id. There is thus no risk of unfairness because the defendant “knows from the very outset that his planned course of conduct is wrongful.” United States v. Feola, 420 U.S. 671, 685, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Even NACDL’s characterization of Harris as imposing “strict liability” is inaccurate, as the' government is still required to establish mens rea with respect to the predicate crime and with respect to the use, carrying, or possession of the firearm.
This is not to say, as Judge Kavanaugh charges, that “the fact that the defendant is a ‘bad person’ who has done ‘bad things’ ... justifies] dispensing with the presumption of mens rea” entirely. Dissent at 544 (Kavanaugh, J., joined by Tatel, J.). Nor can our opinion be read to mean that a defendant’s guilty mind with respect to one type of offense would suffice to allow the imposition of strict liability with respect to a wholly different category of offense. The dissent’s “altar boy” hypothetical is thus beside the point. The dissent claims that under our rationale, an altar boy would be guilty of both larceny and drug possession if he stole a collection bag that, unbeknownst to him, contained a stash of cocaine sewn into the lining. See id. But this is not so, because a person who does not know a bag contains drugs does not “knowingly” possess them. If the boy steals the collection bag, knowing that it contains cash, he has the requisite intent with respect to the theft offense and can therefore be found guilty of larceny. But if the bag also happens to contain cocaine, entirely without his knowledge or complicity, he lacks the knowledge statutorily required for guilt of the controlled substances offense.[2]
Nor is it unusual to punish individuals for the unintended consequences of their unlawful acts. Perhaps the most obvious example is the felony-murder rule. In Dean v. United States, 556 U.S. 568, 129 S.Ct. 1849, 1855, 173 L.Ed.2d 785 (2009), the Supreme Court suggested the machinegun provision and the felony murder rule are analytically congruent. Moreover, courts have concluded similarly structured statutes do not require a showing of mens rea. For example, this Court has interpreted 21 U.S.C. § 841, which imposes an .additional ten-year penalty for trafficking certain types or quantities of drugs, as not requiring the government to prove the defendant knew how much or what type of drug he was selling. United States v. *508 Branham, 515 F.3d 1268, 1276 (D.C.Cir. 2008). Every other circuit to have addressed the question has agreed. See id. at 1275 n. 3 (collecting cases).
Moreover, when asked to infer mens rea requirements in other criminal statutes, neither this Court nor our sister circuits have relied solely on whether a particular provision is an element of the offense or a sentencing factor. Instead, this Court and others have frequently found that certain offense elements do not require proof of an additional mens rea, so long as the offense as a whole carries a •scienter requirement that separates innocent from criminal conduct. If O’Brien required the overturning of Harris, it likely would require the overturning of each of these precedents as well, because there is no obvious way to distinguish them. For example, the Drug Free School Zones Act, 21 U.S.C. § 860, provides heightened penalties for drug distribution within 1,000 feet of a school. In a prosecution under that statute, however, the government need not prove the defendant’s knowledge of his proximity to a school. See United States v. Holland, 810 F.2d 1215, 1223-24 (D.C.Cir.1987); see also United States v. Jackson, 443 F.3d 293, 299 (3d Cir.2006); United States v. Dimas, 3 F.3d 1015, 1022 (7th Cir.1993). Likewise, when interpreting the Controlled Substances Act, 21 U.S.C. § 841, courts do not require proof of the defendant’s knowledge of the type or quantity of the substance, despite each being an element of the offense. See Branham, 515 F.3d at 1275-76; see also, e.g., United States v. King, 345 F.3d 149, 152-53 (2d Cir.2003); United States v. Brower, 336 F.3d 274, 277 (4th Cir.2003); United States v. Villarce, 323 F.3d 435, 439 (6th Cir.2003). Certain statutes involving juveniles, where the victim’s age is an element of the offense — e.g. 18 U.S.C. § 2241(c) (criminalizing the crossing of state lines for purpose of engaging in sex with a minor under the age of 12); 18 U.S.C. § 2423 (the Mann Act) (prohibiting transportation of juveniles across state lines for the purpose of prostitution); 21 U.S.C. § 861 (criminalizing use of a juvenile to commit or conceal a drug offense)— do not require proof of mens rea with respect to the juvenile’s age. See, e.g., United States v. Cox, 577 F.3d 833, 836-38 (7th Cir.2009) (holding that a prosecution under the Mann Act does not require proof of the defendant’s knowledge of the victim’s age); United States v. Taylor, 239 F.3d 994, 996-97 (9th Cir.2001) (same); United States v. Chin, 981 F.2d 1275 (D.C.Cir.1992) (holding that a defendant need not know the juvenile’s age to be convicted of violating 21 U.S.C. § 861); United States v. Williams, 922 F.2d 737, 738-39 (11th Cir.1991) (same).[3] Finally, statutes defining offenses by reference to the value of the property taken or damaged, such as 18 U.S.C. § 2113 (defining different bank robbery offenses based on the value of the property stolen) and 18 U.S.C. § 1361 (providing different offense levels and penalties based on the value of the property damaged) do not require the government to prove that the defendant knew the exact monetary value. Absent either a clear statement from the Supreme Court establishing a presumption of mens rea for every element of an offense or a *509 clear demarcation in our caselaw between our treatment of elements and sentencing factors, we cannot say that the conceptual underpinnings of Harris have been weakened at all, much less weakened so much as to justify abandoning it.
Finally, the argument that the machine-gun provision in § 924(c)(l)(B)(ii) must carry an implicit mens rea requirement simply because the Court has construed it as an offense element ignores the practical distinction between proving objective facts and subjective mental states. The kind of weapon used, like the type and quantity of drug, is a physical fact, readily susceptible to proof beyond a reasonable doubt. As such, Congress could well intend such factors to be offense elements without intending to include an implicit, subjective mens rea requirement. In that sense, this case is similar to Chin, in which we found that the government is not required to prove the defendant’s knowledge of the victim’s age in a prosecution under 21 U.S.C. § 861, because it was “implausible that Congress would have placed on the prosecution the often impossible burden of proving, beyond a reasonable doubt, that a defendant knew the youth he enticed was under eighteen.” 981 F.2d at 1280.
With their quiver of arguments almost empty, Burwell and NACDL claim that certain dicta in O’Brien reveal the Court’s belief — despite its express reservation of the question discussed above — that § 924(c)(l)(B)(ii) contains an implicit mens rea requirement. In O’Brien, the Supreme Court explained that it is “not likely that Congress intended to remove the indictment and jury trial protections” from the machinegun provision of § 924(c). 130 5.Ct. at 2178. The Court cited several factors, including “[t]he immense danger posed by machineguns [and] the moral depravity in choosing the weapon.” Id. NACDL contends this sentence undermines Harris’s statement that “there does not seem to be a significant difference in mens rea between a defendant who commits a drug crime using a pistol and one who commits the same crime using a machine gun.” 959 F.2d at 259. Thus, NACDL claims the O’Brien Court held the varying penalties attached to the different crimes enumerated in § 924(c) “are pegged, inter alia, to the defendant’s relative moral blameworthiness, i.e., to differing levels of scienter.” NACDL Br. at 10.
An argument that relies on one sentence of dicta from a Supreme Court opinion is necessarily tenuous, and this one is especially so. Burwell’s attempt to pluck this clause out of O’Brien, strip it of all context, and use it as justification for overturning established precedent is unconvincing. In O’Brien, the critical question was whether Congress’s decision to amend § 924(c) to provide mandatory minimum sentences[4] should alter the Court’s characterization of the machinegun provision as an element of the offense or a sentencing factor.[5] O’Brien, 130 S.Ct. at 2178. The Court’s statement, in context, is one consideration in the evaluation of one of the five factors bearing on the decision’s holding.[6] As such, it hardly rises to the level *510 of an “intervening [legal] development,” Patterson, 491 U.S. at 173, 109 S.Ct. 2363, let alone one that could fundamentally undermine longstanding precedent.
Moreover, another recent Supreme Court opinion strongly suggests that — contrary to Burwell’s argument — the penalties in § 924(c) are not precisely calibrated to the level of mens rea. The Court in Dean concluded the discharge provision of § 924(c)(l)(A)(iii) requires no separate proof of intent. See 129 S.Ct. at 1856. In so holding, the Court noted that a § 924(c) defendant whose firearm discharges “is already guilty of unlawful conduct twice over: a violent or drug trafficking offense and the use, carrying, or possession of a firearm in the course of that offense.” Id. at 1855. Accordingly, “[t]he fact that the actual discharge of a gun ... may be accidental does not mean that the defendant is blameless,” and the sentencing enhancement in § 924(c)(l)(A)(iii) properly “accounts for the risk of harm resulting from the manner in which the crime is carried out, for which the defendant is responsible.” Id. To be sure, Dean is not dispositive here, because the Court found that the discharge provision is a sentencing factor rather than a separate element of the offense. Id. at 1854. Still, the Court’s analysis suggests that a mens rea requirement is not, as Burwell and his amici suggest, mechanically linked to the various provisions of the statute in accordance with the relative severity of the penalty.
Finally, the FPD argues this Court implicitly overruled Harris in United States v. Brown, which noted that Harris had been “somewhat undermined” by the Supreme Court’s statement in Castillo that the difference between carrying a pistol and a machinegun is “great, both in degree and kind.” 449 F.3d 154, 158 (D.C.Cir. 2006) (quoting Castillo, 530 U.S. at 126, 120 S.Ct. 2090). But Brown’s reading of Harris is more accurately characterized as equivocal, as the Court proceeded to acknowledge that Harris’s reading of the machinegun provision “might be reasonable” given “the hazard of the weapon itself (which in almost all instances would likely be obvious to the defendant).” Id. at 158.[7] Questioning the continuing viability of a precedent is a far cry from implicitly overruling it, particularly where, as in Brown, the precedent is not directly relevant to the issue before the Court.[8] In sum, we conclude that Burwell and his amici have failed to establish that any intervening legal development has weakened, much less removed, the conceptual underpinnings of Harris. Patterson, 491 U.S. at 173, 109 S.Ct. 2363.
b. Decisions of Other Circuits
This Court may also overrule its established interpretation of a statute “if it finds that other circuits have persuasively argued a contrary construction.” Critical Mass Energy Project, 975 F.2d at 876. Burwell urges us to overturn Harris be *511 cause each circuit that has decided the machinegun provision is an element of a § 924(c) offense has also assumed that knowledge of the type of weapon is required. See United States v. Franklin, 321 F.3d 1231, 1240 (9th Cir.2003) (finding that evidence was sufficient to show the defendant “knew the weapon was capable of being fired in an automatic setting”); United States v. Rodriguez, 54 Fed.Appx. 739, 747 (3d Cir.2002) (assuming without deciding that knowledge of the type of weapon is an element of the offense); United States v. Dixon, 273 F.3d 636, 640-41 (5th Cir.2001) (assuming without deciding that Castillo makes defendant’s knowledge of the weapon’s automatic firing capability an element of the offense).
As Burwell seems to concede, however, no circuit has rejected Harris. In fact, none of the cases Burwell cites even consider the analysis in Harris. In Franklin, for example, the court concluded that the evidence presented was sufficient for a rational jury to find that the defendant knew the weapon was capable of being fired in an automatic setting, citing neither § 924(c)(l)(B)(ii) nor Harris’s analysis of that provision. 321 F.3d at 1240. Similarly, in both Rodriguez and Dixon, the courts concluded — without wrestling with the larger question of whether knowledge was required — that any failure to submit the element of knowledge to the jury was harmless error. See Rodriguez, 54 Fed.Appx. at 747; Dixon, 273 F.3d at 641. None of these cases can be reasonably construed as rejecting our analysis in Harris.
Moreover, an equal number of circuits have held that the maehiiiegun provision does not contain an implied knowledge requirement, although some have done so based on their conclusion that the provision is a sentencing enhancement. See United States v. Ciszkowski, 492 F.3d 1264, 1268-69 (11th Cir.2007) (basing holding on language of the statute and inapplicability of Staples); United States v. Gamboa, 439 F.3d 796, 812 (8th Cir.2006) (basing holding on the view that the machinegun provision was a sentencing factor); United States v. Eads, 191 F.3d 1206, 1212-14 (10th Cir.1999) (same). All of these cases — including the ones cited by Burwell and his amici — were decided prior to O’Brien, however, so it is unclear how these other circuits will evaluate the impact of that decision on their respective analyses of § 924(c)’s mens rea requirement. At best, Burwell can plausibly claim that three other circuits have implied — though not actually decided — that they would reject Harris if forced to decide the question. One other circuit has implied that it would continue to follow Harris’s logic. The possibility of a future circuit split hardly constitutes the “tide of recent judicial developments” necessary to justify overruling an established precedent. Critical Mass Energy Project, 975 F.2d at 876.
c. Fundamental Flaws in Harris’s ' Analysis
The final basis on which an en banc court may set aside its own precedent is “if, on reexamination of an earlier decision, it decides that a panel’s holding on an important question of law was fundamentally flawed.” Id. Despite appellant’s arguments to the contrary, wé remain convinced that Harris interpreted § 924(c) correctly.
Section 924(e)(l)(B)(ii) is silent regarding a mens rea requirement, and the Supreme Court has “ordinarily resisted] reading words or elements into a statute that do not appear on its face.” Dean, 129 S.Ct. at 1853. The text of § 924(c)(l)(B)(ii) provides that the machinegun penalty is triggered if the fire *512 arm “is” a machinegun — which refers to a state of being that exists “without respect to a specific actor, and therefore without respect to any actor’s intent or culpability.” Id. In other words, Congress’s grammatical choice telegraphs its intent to eliminate an additional mens rea requirement for that particular provision. After all, a firearm “is” a machinegun, whether the defendant knows it or not.
The structure of the statute and the context of § 924(c)(l)(B)(ii) also suggest that Congress did not intend it to include a mens rea requirement. Dean noted Congress had defined the “brandishing” provision, 18 U.S.C. § 924(c)(1)(A)(ii), to include a mens rea requirement because to “brandish” means “to display ... in order to intimidate.” Id. § 924(c)(4). Congress did not, however, include such a requirement for any of the other provisions in § 924(c). “[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Dean, 129 S.Ct. at 1854. Here, it cannot be said that Congress simply forgot about mens rea when it drafted § 924(c), as the drafters of the statute quite clearly chose to require a showing of intent for one particular provision but not for the others.
At oral argument, Burwell nonetheless contended that the implicit scienter requirement in § 924(c) must be applied to the machinegun element in § 924(c)(1)(B)(ii), citing the Supreme Court’s decision in Flores-Figueroa v. United States, 556 U.S. 646, 129 S.Ct. 1886, 173 L.Ed.2d 853 (2009), and our own opinion in United States v. Villanueva-Sotelo, 515 F.3d 1234 (D.C.Cir.2008), for the proposition that mens rea must apply to every element of the offense, unless Congress clearly indicates otherwise. See, e.g., Oral Arg. Recording 9:20 — 9:45. But neither Flores-Figueroa nor Villanueva-Sotelo stands for that sweeping proposition. Rather, the holdings in those cases rested on circumstances not present here: namely, rules of “ordinary English grammar” indicated that the word “knowingly” in 18 U.S.C. § 1028A(a)(l)[9] be read to apply to “all the subsequently listed elements of the crime,” Flores-Figueroa, 129 S.Ct. at 1890; see generally Villanueva-Sotelo, 515 F.3d at 1239-41, and Congress’s use of the statutory title “aggravated identity theft” suggested that the offender must “know that what he has taken identifies a different real person,” Flores-Figueroa, 129 S.Ct. at 1893; see Villanueva-Sotelo, 515 F.3d at 1246. The question before the Court was thus primarily one of statutory construction — in other words, the Court had to determine how far down the sentence the word “knowingly” traveled. Here, by contrast, § 924(c)(1)(B)(ii) contains no “phrase ... that introduces the elements of [the] crime with the word ‘knowingly.’ ” Flores-Figueroa, 129 S.Ct. at 1891. And the structure and legislative history of § 924(c) contain no clues that Congress intended for an implied scienter requirement to modify the weapon-specific sub-provisions in § 924(c)(1)(B).
Finally, the purpose of § 924(c) is quite clear: “to persuade the man who is tempted to commit a Federal felony to leave his gun at home.” Muscarello v. United States, 524 U.S. 125, 132, 118 S.Ct. 1911, *513 141 L.Ed.2d 111 (1998). The higher penalties attached to -the use of the most dangerous kinds of firearms reflect Congress’s desire to create a deterrent commensurate with the increased danger posed by these weapons. See id. (citing legislative history of § 924(c)). Burwell argues, however, that a mens rea requirement is necessary to effectuate Congress’s deterrent purpose, as deterrence “assumes that potential violators can anticipate what punishment they might receive.” United States v. Cavera, 550 F.3d 180, 223 (2d Cir.2008) (Sotomayor, J., dissenting in part). Sentencing defendants for using a machinegun without first, ensuring that they knew the weapon’s characteristics “converts a deterrent statute to one that is mainly punitive.” Reply Br. at 11-12.
In so arguing, appellants adopt an unduly crabbed definition of “deterrence.” To be sure, a statute might aim to deter each individual offender from committing a particular crime (or in this case, choosing a particular weapon to commit a crime), which implicitly requires that the offender make a conscious choice to engage (or not) in a particular course of conduct. But a statute might also attempt to deter offenders more generally through the imposition of a particularly severe penalty for a certain offense. In the case of § 924(e)(l)(B)(ii), for example, Congress likely attached such' a steep penalty to the use of a machinegun in an attempt to deter all offenders from using such weapons. This broader understanding of “deterrence” does not require that each individual offender convicted under the statute have mens rea with respect to the machinegun, because the deterrent value of the statute arises out of its capacity to deter future offenders. As the Court stated in Dean, in the course of holding that the discharge provision in § 924(c)(1)(A)(iii) applies even if the defendant did not intend to fire the weapon, “[t]hose criminals wishing to avoid the penalty for an inadvertent discharge can lock or unload the firearm [or] handle' it with care during the underlying violent or drug trafficking crime.” 129 S.Ct. at 1856. Similarly, a defendant wishing to avoid the 30-year mandatory minimum for using, carrying, or possessing a machinegun can carefully inspect his weapon, “leave the gun at home, or — best yet — avoid committing the felony’ in the first place.” Id.
NACDL argues the severity of the penalty for violating § 924(c) (1) (B) (ii) — a mandatory minimum sentence of 30 years’ imprisonment — heightens the intuition that Congress would not eliminate the mens rea requirement. NACDL Br. at 19-20. NACDL notes strict liability “public welfare” statutes are “disfavored” and generally involve only light penalties, such as fines or short jail sentences. Staples, 511 U.S. at 607, 616, 114 S.Ct. 1793. They further contend that because the Supreme Court deemed the 10-year sentences in Staples and X-Citement Video to be “harsh,” the machinegun provision’s mandatory penalty of a consecutive 30 years to life “can only be described as draconian.” NACDL Br. at 21.
Amicus’ attempt to broaden the reach of existing precedent is -unconvincing. In Staples, as explained above, the Court’s consideration of the severity of the penalty was decidedly narrow.. The Court expressly declined to adopt a sweeping rule of construction that would endorse consideration of the severity of the penalty as an element in determining whether mens rea is required. Rather, the Court “note[d] only that where, as here, dispensing with mens rea would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a mens rea requirement.” Staples, 511 U.S. at 618, 114 S.Ct. *514 1793; see also X-Citement Video, 513 U.S. at 72, 115 S.Ct. 464 (evincing the same concern about imposing harsh penalties on actors who had no idea they were violating the law). This is obviously not the case with respect to § 924(c)(l)(B)(ii), as any defendant faced with the machinegun provision’s mandatory 30-year penalty must already have been found guilty of a predicate violent crime or drug trafficking offense, and must have intentionally used, carried, or possessed a firearm during and in relation to, or in furtherance of, that offense.
Burwell’s comparison of § 924(c) to “strict liability crimes” is inapposite for the same reason. In contrast to traditional “public welfare” offenses, under which the government need not prove mens rea at all, the government is required under this statute to first establish mens rea with respect to the predicate offense, and then to prove that the defendant intentionally used, carried, or possessed a firearm in the course of that crime. Similarly, Burwell’s comparison of penalties fails to recognize the fundamentally different contexts in which those penalties are imposed. In both Staples and X-Citement Video, the Court declined to impose 10 years’ imprisonment on defendants who would otherwise not be convicted of any crime. Here, by contrast, the defendants already face substantial sentences for committing a violent crime. While an additional 30 years obviously represents a substantial multiple of their sentence, its severity pales in comparison to imposing a lengthy jail sentence on a person who would otherwise be free. Moreover, as noted above, several federal statutes expressly impose severe penalties without requiring mens rea for every element of the offense. See, e.g., Branham, 515 F.3d at 1275-76 (imposing penalty of 10 years to life for possession with intent to distribute certain types and quantities of drugs without requiring proof of additional mens rea under 21 U.S.C. § 841).
Finally, Burwell and the Federal Public Defender argue Harris was fundamentally flawed because it imposes unjust penalties on co-conspirators. They note that without a separate knowledge requirement, “mere” co-conspirators in low-level drug conspiracies might be subjected to 30-year sentences for violent or drug-trafficking crimes committed with machineguns in furtherance of the conspiracy, as long as it is reasonably foreseeable that such crimes would involve guns of any kind. This would be unjust, the FPD argues, if the particular defendant “had no reason to foresee, let alone know, that some member of the conspiracy — any member — would use or possess a machinegun (as opposed to a generic firearm).” FPD Br. at 14. But the premise of this argument is not necessarily correct. The Supreme Court has not extended vicarious liability to situations in which “the substantive offense ... could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.” Pinkerton v. United States, 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Because the machinegun provision is an element of the substantive § 924(c) offense, it is not clear (and we express no opinion as to) whether liability would attach to co-conspirators who could not reasonably foresee the use of the machinegun.[10]
For these reasons, we remain unpersuaded that Harris was fundamentally *515 flawed as a matter of law, and therefore conclude appellant failed to demonstrate any of the considerations that would justify overruling Harris. Accordingly, we need not reach appellant’s claim that if § 924(c) contains a knowledge requirement, the evidence was insufficient to sustain his conviction.
Ill
Appellant also claims that in light of O’Brien, the rule of lenity -requires the Court to vacate his conviction under § 924(c)(i)(B)(ii). Appellant’s Br. at 28. The rule of lenity prevents the interpretation of a federal criminal statute “so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.” United States v. Villanueva-Sotelo, 515 F.3d 1234, 1246 (D.C.Cir.2008). But to invoke the rule of lenity, a court must conclude that “there is a grievous ambiguity or uncertainty in the statute.” Muscarello, 524 U.S. at 139, 118 S.Ct. 1911 (emphasis added). “The simple existence of some statutory ambiguity ... is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree.” Id. at 138, 118 S.Ct. 1911. There is no grievous ambiguity here because, as this Court held twenty years ago in Harris, the structure, statutory context, and purpose of § 924(c)(l)(B)(ii) all make clear that the provision does not contain a separate mens rea requirement. Indeed, as the Supreme Court held in Dean when declining to apply the rule of lenity to § 924(c)(l)(A)(iii), “the statutory text and structure convince us that” Congress did not require proof of any additional mens rea, and Burwell’s “contrary arguments are not enough to render the statute grievously ambiguous.” 129 S.Ct. at 1856.
IV
Because the principle of stare decisis is “of fundamental importance to the rule of law,” Welch, 483 U.S. at 494, 107 S.Ct. 2941, this Court imposes a substantial burden on a party advocating the abandonment of an established precedent. We will not overturn our prior decision simply because a reading of Supreme Court dicta might support some inference that the Court might, in some future case, come to question our approach. Our job is simply to apply the law as it currently existí
Judge Kavanaugh’s dissent makes two dubious claims. First, he argues that the Supreme Court’s precedents definitively establish that neither statutory silence, nor Congress’s decision to include mens rea in certain parts of a statute but omit it in others, serves to defeat the presumption of mens rea. Second, he contends that the Supreme Court has established and applied a rule of statutory interpretation for federal crimes wherein the Court imputes the presumption of mens rea to each element of an offense unless plainly — i.e., explicitly — indicated otherwise. Flores-Figueroa is the lever with which the dissent proposes to upend decades of precedent and establish the bona fides of these otherwise unmoored assertions. But that case is-not up to the task.
Judge Kavanaugh’s attempt to analogize our position to that of the government in Flores-Figueroa is inapt, because that case — as he -acknowledges — involved a statute containing an explicit mens rea requirement. See 18 U.S.C. § 1028A (punishing someone who “knowingly transfers, possesses, or uses ... a means of identification of another person” while committing an enumerated predicate crime); 129 S.Ct. at 1888-89. Section 924(e)(l)(B)(ii) contains no such language. Judge Kavanaugh’s argument boils down to the assertion that we should rewrite the text of *516 § 924(c) and imply a mens rea requirement where none was meant to exist, in the service of an assertedly strong “traditional presumption of mens rea” applicable to every element of an offense.
Historically, the altar boy archetype, ie., innocent conduct, justified imposition of an extratextual gloss on statutes that lacked an explicit scienter requirement. In Flores-Figueroa, the Court rejected the government’s argument that the absence of innocence should circumscribe the reach >f)f an explicit mens rea requirement. Judge Kavanaugh insists this portends a major shift in the Court’s jurisprudence. Perhaps. But ignoring the lack of an innocence rationale where a statute contains an express requirement does not mean innocence is irrelevant where the statute is silent. Indeed, the Court’s strongly textual approach in Flores-Figueroa counsels against judicial creation of a mens rea requirement for every element in the face of statutory silence.
Judge Kavanaugh, applying rules of his own creation, ignores the role of innocence and concludes the mens rea presumption— writ large — still justifies an extratextual (or even countertextual) reading of the statute, because that background presumption applies to every element of a criminal offense unless Congress expressly disclaims it. Nothing in Flores-Figueroa or any other Supreme Court precedent supports that result.
Judge Rogers’ approach is even more unbounded. Her solution — a balancing test completely unmoored from circuit or Supreme Court precedent — is substantially broader than anything we have proposed. See id. at 526 (“I would take my lead from Staples and simply hold that the thirty-year term of imprisonment ... is so severe in length that it outweighs the fact that the conduct prohibited is not otherwise innocent[.]”). Nowhere does Staples, or any other case, suggest these two considerations should be balanced in order to determine whether a court should imply a mens rea requirement when faced with statutory silence. If anything, such an open-ended test, creates a much greater potential for spillover into a “host of other applications” than does our solution, which is firmly rooted in the text and structure of § 924(c) (1) (B) (ii).
Finding nothing in the Supreme Court’s holdings, our own caselaw, or “deeply rooted principles of law and justice,” Kavanaugh Dissent at 527, that would justify overturning our decision in Harris, we affirm our previous conclusion that § 924(c) (1) (B) (ii) does not require the government to prove that a defendant knew that the weapon he used, carried, or possessed was a machinegun. Accordingly, we reinstate the panel opinion and affirm appellant’s conviction.

. Although the four guns functioned similarly, each had a unique appearance. One of the guns was chrome and had a folding stock (the “AK-chrome”), one had two handles and no stock (the "AK-two handles”), one had a real wood grip in the front and an under-folding stock, to which Chtaini fastened a strap (the "AK-strap”), and one had a spring-loaded bayonet under the barrel (the "AK-bayonet”).

. A more apt analogy might be a defendant who is prosecuted under the Controlled Substances Act, 21 U.S.C. § 841, for distributing heroin. Even if the defendant genuinely believed the substance was cocaine, that would not render his conviction under § 841(b)(l)(A)(i) or (B)(i) a "strict liability” drug offense. As every circuit to consider this question has held, the government is not required to prove — as would often be extraordinarily difficult if not impossible — "the defendant’s knowledge of the type of drug at issue in his offense.” See, e.g., Branham, 515 F.3d at 1275-76 & n. 3 (collecting cases). Yet the dissent never even acknowledges the fundamental inconsistency between its reasoning and these holdings.

. At oral argument, Burwell claimed that statutes involving juveniles are different from the machinegun provision at issue here because the purpose of statutes like the Mann Act is to protect the children involved. Although this is undoubtedly true to some degree, some of these statutes might also have had other purposes, such as preventing defendants from using juveniles to insulate themselves from prosecution. See, e.g., 21 U.S.C. § 861. In any event, courts have declined to read a mens rea requirement into these statutes based on their text. See, e.g., Cox, 577 F.3d at 836-37; Taylor, 239 F.3d at 996-97.

. The previous version, provided mandatory sentences.

. In Castillo, the Court held that § 924(c)(l)(B)(ii) uses the word "machine-gun” to state an element of a separate offense. 530 U.S. 120, 121, 120 S.Ct. 2090 (2000). Congress subsequently amended the language of § 924(c), leading the Court to revisit the same issue in O'Brien, 130 S.Ct. at 2172.

. In determining whether the machinegun provision in § 924(c) constituted an element or sentencing factor, the Court in Castillo examined five factors directed at determining congressional intent: (1) language and structure, (2) tradition, (3) risk of unfairness, (4) *510 severity of the sentence, and (5) legislative history. O’Brien, 130 S.Ct. at 2175. The “moral depravity” statement appeared in the Court’s analysis of the fourth factor, alongside the Court’s recognition of "[t]he immense danger posed by machineguns.” Id. at 2178.

. The Federal Public Defender also overlooks the fact that this Court followed Harris in United States v. Gilliam, when it approved Harris’s reasoning and applied it to the semiautomatic assault weapon provision of § 924(c)(1). 167 F.3d 628, 637-38 (D.C.Cir. 1999). Because Gilliam was decided before Castillo, however, this omission has no effect on whether the Supreme Court's statement in Castillo undermined the rationale of Harris.

. Brown held that § 924(c)(l)’s discharge provision contains an implied intent requirement, a conclusion overruled by the Supreme Court in Dean, 129 S.Ct. at 1853-56.

. The federal identity theft statute, 18 U.S.C. § 1028A, imposes a mandatory consecutive two-year prison term on individuals convicted of other crimes if during and in relation to the commission of those other crimes, the defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.”

. Moreover, to the extent that the FPD objects to finding "mere” co-conspirators vicariously liable for acts committed by their conspirators, his problem lies with the law of conspiracy, not with § 924(c). The Court should not manipulate the mens rea requirement to account for some perceived injustice wrought by the elements of criminal conspiracy-